**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| James Pickard,<br><br>Plaintiff,<br><br>vs.<br><br>Safety Holdings, Inc. d/b/a SambaSafety<br><br>Defendant. | **Case No.:**<br><br>**COMPLAINT AND JURY TRIAL DEMANDED** |

James Pickard ("Plaintiff"), by and through the undersigned counsel brings the following Complaint and Demand for Jury Trial against Safety Holdings Inc. d/b/a SambaSafety ("SambaSafety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background report that SambaSafety published to Plaintiff's employers, which inaccurately portrayed Plaintiff as though his driver's license was ***suspended***.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorneys' fees brought against SambaSafety pursuant to the FCRA, 15 U.S.C. §§ 1681, *et seq.*

2. SambaSafety is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. In 2025, SambaSafety falsely reported to Plaintiff's employers, Uber, Uber Eats, and Lyft, that Plaintiff's driver's license was suspended in February 2022 and May 2022. SambaSafety's reporting is grossly misleading and flagrantly inaccurate.

4. Plaintiff's driver's license was never suspended. In reality, Plaintiff's **commercial driver's license privileges** ("CDL") were suspended in May 2022. Furthermore, Plaintiff's CDL was never suspended in May 2022. Plaintiff's non-commercial driver's license is and at all times has been active and current.

5. Plaintiff's employers, Uber, Uber Eats, and Lyft, suspended/deactivated Plaintiff's accounts after receiving an employment background check report from Defendant, which inaccurately portrayed Platiniff's driver's license was suspended.

6. SambaSafety's inaccurate reporting could have easily been avoided had SambaSafety maintained reasonable procedures to assure that it does not conflate the suspension of a CDL with that consumer's non-commercial driver's license.

7. SambaSafety does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. SambaSafety's failure to employ reasonable procedures resulted in Plaintiff's report being flagrantly inaccurate.

8. SambaSafety committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their employers with inaccurate information.

9. SambaSafety's inaccurate report cost Plaintiff a good paying job and job security.

10. As a result of SambaSafety's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to

his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

11. Accordingly, Plaintiff brings claims against SambaSafety for failing to follow reasonable procedures to assure maximum possible accuracy of Plaintiff's background reports, in violation of FCRA, 15 U.S.C. § 1681e(b), for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed was inaccurate and should be corrected in the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i, and for failing to provide a copy of the subject consumer report to Plaintiff upon his request in violation of the FCRA, 15 U.S.C. § 1681g.

## PARTIES

12. James Pickard ("Plaintiff") is a natural person residing in Murfreesboro, Tennessee, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13. Defendant Safety Holdings Inc. d/b/a SambaSafety is a California corporation doing business throughout the United States, including the State of Tennessee and in this District, and has a principal place of business located at 8801 Horizon Blvd Ne, Suite 200 Albuquerque, NM 87113.

14. Among other things, SambaSafety sells background reports to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

15. SambaSafety is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling

information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

18. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

19. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

20. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

21. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS AND EMPLOYEES

22. Despite its name, the FCRA covers more than just credit reporting, it also regulates background reports like the one SambaSafety prepared in Plaintiff's name.

23. The FCRA provides many protections for consumers who are the subject of background reports for purposes of securing employment, housing, and other purposes.

24. In the parlance of the FCRA, background reports – also referred to as background checks – are "consumer reports," and providers of background reports, like SambaSafety, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

25. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

26. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. SambaSafety disregarded its duties under the FCRA with respect to Plaintiff's background report.

## SAMBASAFETY'S ILLEGAL BUSINESS PRACTICES

28. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background reporting industry.

29. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

30. The criminal background reporting industry takes in revenues in excess of three billion dollars, annually.[2]

31. Criminal background reports are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background reports.

32. Background reporting companies, like SambaSafety, collect millions of public records from a number of sources with data from county, state, and federal level sources. The data included in the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from courts and Department of Motor Vehicles websites.

33. Given that SambaSafety is in the business of selling background reports, SambaSafety should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

34. In the Sixth Circuit, information is "inaccurate" under the FCRA if it is either "patently incorrect" or "misleading in such a way and to such an extent that it could have been

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

expected to have an adverse effect on the consumer." *See Berry v. Experian Info. Sols., Inc.*, 115 F.4th 528, 536 (6th Cir. 2024) (cleaned up).

35. SambaSafety places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for SambaSafety to produce reports containing information that is inaccurate and incomplete than it is for SambaSafety to exert proper quality control over the reports prior to their being provided to SambaSafety's customers.

36. SambaSafety reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

37. SambaSafety charges its customers the same price for reports that are grossly inaccurate, as it does for accurate reports.

38. Appropriate quality control review of Plaintiff's report would have made clear that SambaSafety was reporting Plaintiff's driving history information as though his driver's license was suspended, when in fact this was patently incorrect.

39. As a provider of background reports, SambaSafety should be aware of the FCRA requirements and is likely aware of trade groups that could help them understand these requirements, such as the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment with Uber, Lyft, and Uber Eats

40. Plaintiff is the sole provider for his wife, who is unable to work due to illness, and their two young children.

41. Plaintiff has worked as a full-time driver for over a decade, and – until recent events caused by SambaSafety – was working as a driver for Uber.

42. Plaintiff also began driving for Lyft in 2020 to supplement his income.

43. Plaintiff also occasionally drove for Uber Eats during period in which Uber and Lyft were slow.

44. Rideshare and food delivery driving was Plaintiff's only source of income.

45. Since 2014, Plaintiff's employment with Uber has been consistent and uninterrupted.

46. Prior to SambaSafety's inaccurate reporting, Plaintiff drove for Uber nearly every day and made between $1,000-2,000 per week.

47. Prior to SambaSafety's inaccurate reporting, Plaintiff drove for Lyft often and made approximately $500 per week.

48. In or around 2011, Plaintiff sought and obtained his CDL.

49. In May 2022, Plaintiff's CDL was suspended.

50. To be clear, **only** Plaintiff's CDL was affected; at no juncture was Plaintiff's non-commercial driver's license suspended.

**SambaSafety's Procedures for Reporting Driving Records to Uber, Uber Eats, and Lyft**

51. Uber, Uber Eats, and Lyft each contract with SambaSafety to conduct periodic background reports, including checks regarding driver's license validity, on their employees.

52. SambaSafety regularly prepares background reports for Uber, Uber Eats, and Lyft containing driving records that SambaSafety obtains from various state entities.

53. Upon information and belief, SambaSafety has a contractual agreement with the Tennessee Department of Safety and Homeland Security Driver Services Division ("DSD") to purchase driving records about Tennessee consumers.

54. The DSD maintains driving records on all drivers licensed in the state of Tennessee called Motor Vehicle Reports, or "MVRs."

55. Upon information and belief, when Uber, Uber Eats, or Lyft request a background report from SambaSafety about an applicant or employee (the "Driver") who holds a Tennessee driver's license, SambaSafety requests driving records about that Driver from the Tennessee DSD.

56. Upon information and belief when SambaSafety requests driving records from the DSD about a particular Driver, the Driver's MVR is communicated electronically from the DSD to SambaSafety.

57. The communication between the DSD and SambaSafety contains what SambaSafety refers to as "raw" data, which is then mapped to certain fields within SambaSafety's technological infrastructure.

58. The "raw" data that SambaSafety receives from the DSD contains substantially the same information that appears in the DSD's "official" version of each driver's MVR.

59. Once SambaSafety's system has received the "raw" data from the DSD, SambaSafety "parses, interprets and presents that information in a unified output format". SambaSafety's algorithm is even used to interpret information in general purpose text fields. Complaint at 18, *Safety Holdings Inc. Et Al V. Checkr, Inc. Et Al*, (N.D. California 2020) (No. 3:20-cv-03004).

60. The communication between the SambaSafety and Uber systems is a method of communication that was specifically designed for SambaSafety to be able to transmit its reports to Uber electronically.

61. Upon information and belief, the communication between the SambaSafety and Lyft systems is a method of communication that was specifically designed for SambaSafety to be able to transmit its reports to Lyft electronically.

**Defendant Published an Inaccurate Background Check Report to Lyft**

62. In or around March 2025, Lyft ordered its periodic background check on Plaintiff from SambaSafety.

63. SambaSafety completed its background report concerning Plaintiff on or about March 11, 2025.

64. Within that background report, SambaSafety published inaccurate and misleading information concerning Plaintiff.

65. Specifically, SambaSafety's background report concerning Plaintiff included two flagrantly inaccurate and stigmatizing driver's license suspensions/ revocations from Tennessee, which appeared in the consumer report as follows:

**Suspensions/Revocations**

| ACTIONS | ORD/DATE | EFF/DATE | CLR/DATE | END/DATE | CODE | DESCRIPTION | AVD |
|---|---|---|---|---|---|---|---|
| SUSPENSION | | 02/03/2022 | | | | FAIL FILE- MEDICAL/DISABL | DH02 |
| SUSPENSION | | 05/26/2022 | | | | FAIL FILE- MEDICAL/DISABL | DH02 |

66. In reality, as detailed herein, Plaintiff's driver's license was never suspended. Plaintiff had, and currently has, an active, valid driver's license

67. Rather, his **CDL** was suspended in May 2022.

68. SambaSafety's reporting failed to distinguish that Plaintiff's CDL only had been suspended.

69. Further, neither Plaintiff's non-commercial driver's license nor CDL was suspended in February 2022 (both inaccurately reported suspensions together, "the Inaccurate Suspensions").

70. The sole reason SambaSafety inaccurately and misleadingly reported Plaintiff's driver's license was that SambaSafety failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the background report it sold concerning Plaintiff to Plaintiff's employer.

71. Had SambaSafety followed reasonable procedures, it would not have reported a suspension from February 2022.

72. Had SambaSafety followed reasonable procedures, it would have clearly distinguished the suspensions/revocations from May 2022 as affecting Plaintiff's CDL only.

73. SambaSafety had notice that its initial reporting was inaccurate because the information SambaSafety received from the DSD made clear that the suspension was of Plaintiff's CDL.

74. SambaSafety's proprietary algorithm failed to correctly parse, interpret, and present the raw data it received about Plaintiff from the DSD.

75. Upon information and belief, SambaSafety's algorithm determined it was unnecessary to include any indication that the suspension was of Plaintiff's CDL even though the information it received from the DSD included this information.

76. Reporting Plaintiff's suspension/revocation without additional context that his non-commercial license was not suspended is inaccurate because it provides a materially misleading impression of Plaintiff's driver's license status and a materially misleading impression of the suspension itself.

77. Furthermore, SambaSafety was reporting a suspension/revocation that **never** occurred.

78. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Lyft inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Lyft Deactivates Plaintiff's Account**

79. On or about March 11, 2025, Plaintiff discovered he was unable to access his Lyft account.

80. Plaintiff immediately called Lyft to determine why his account was deactivated and to determine what needed to be done to have it reinstated.

81. During his call, Plaintiff learned that Lyft deactivated his account based on the contents of a consumer report SambaSafety prepared and sold to Lyft. The Lyft representative refused to reactivate the account unless and until SambaSafety corrected the reporting.

82. Plaintiff also tried to communicate with Lyft through its platform to reactivate his account, but to no avail.

83. Shortly thereafter, Plaintiff obtained a copy of the subject consumer report and was dismayed and shocked upon reviewing the February 2022 and May 2022 driver's license suspensions contained within the subject consumer report.

84. Plaintiff was worried not only about the effect this reporting would have on his employment with Lyft, but also concerned that this inaccurate reporting might jeopardize his employment with Uber and possible future opportunities.

85. Shortly thereafter, Plaintiff obtained a copy of the subject consumer report and was shocked upon reviewing the inaccurate license suspensions contained within the subject consumer report, both in relation to the Lyft position, but also the impact of the same on his future.

86. Specifically, Defendant's inaccurate consumer reporting falsely portrayed Plaintiff's CDL suspension as affecting his driver's license, as well as reporting a prior suspension that never occurred.

**Defendant Published an Inaccurate Background Check Report to Uber**

87. Unbeknownst to Plaintiff, in or around May 2025, Uber ordered a Driver Record Report ("background report") on Plaintiff from Defendant.

88. Upon information and belief, SambaSafety completed its background report concerning Plaintiff on or about May 2025.

89. Upon information and belief, within that background report, SambaSafety published the Inaccurate Suspensions.

90. Upon information and belief, SambaSafety's reporting failed to distinguish that Plaintiff's CDL only had been suspended.

91. Further, neither Plaintiff's non-commercial driver's license nor CDL was suspended in February 2022.

92. The sole reason SambaSafety inaccurately and misleadingly reported Plaintiff's driver's license was that SambaSafety failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the background report it sold concerning Plaintiff to Plaintiff's employer.

93. Had SambaSafety followed reasonable procedures, it would not have reported a suspension from February 2022.

94. Had SambaSafety followed reasonable procedures, it would have clearly distinguished the suspensions/revocations from May 2022 as affecting Plaintiff's CDL only.

95. SambaSafety had notice that its initial reporting was inaccurate because the information SambaSafety received from the DSD made clear that the suspension was of Plaintiff's CDL.

96. SambaSafety's proprietary algorithm failed to correctly parse, interpret, and present the raw data it received about Plaintiff from the DSD.

97. Upon information and belief, SambaSafety's algorithm determined it was unnecessary to include any indication that the suspension was of Plaintiff's CDL even though the information it received from the DSD included this information.

98. Reporting Plaintiff's suspension/revocation without additional context that his non-commercial license was not suspended, is inaccurate because it provides a materially misleading impression of Plaintiff's driver's license status and a materially misleading impression of the suspension itself.

99. Upon information and belief, in addition, SambaSafety was reporting a suspension/revocation that **never** occurred.

100. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

101. After Lyft deactivated his account, Plaintiff decided to try and replace some of the lost income through driving more for Uber.

**Uber Deactivates Plaintiff's Account**

102. On or about May 10, 2025, Plaintiff opened the Uber app to accept rides. Much to his confusion, however, was unable to access his Uber account.

103. Plaintiff immediately contacted Uber to determine why his account was deactivated and to determine what needed to be done to have it reinstated and learned that Uber deactivated his account based on the contents of a consumer SambaSafety reported and sold to Uber in Plaintiff's consumer report.

104. That same day, Plaintiff received an email from Uber notifying him that he was ineligible to earn through Uber as a direct result of the information SambaSafety reported and sold to Uber in Plaintiff's consumer report.

105. This email said that based on the results of the background check from SambaSafety his driver's license was not valid.

106. This reporting was inaccurate as Plaintiff's driver's license was valid.

**Plaintiff's May 2025 Dispute to SambaSafety**

107. On or about May 10, 2025, desperate to resume his ability to earn income working for Uber and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with SambaSafety through its online portal by completing a Consumer Dispute Form.

108. Plaintiff identified himself and provided information to SambaSafety to support his dispute.

109. On or about June 10, 2025, Plaintiff received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute and determined that its reporting was accurate and that it would not correct the subject consumer report otherwise.

110. Defendant failed to issue a corrected consumer report to Uber.

111. Defendant failed to conduct a reasonable reinvestigation of Plaintiff's May 2025 dispute and failed to correct the inaccurate information in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Published an Inaccurate Background Check Report to Uber Eats**

112. Unbeknownst to Plaintiff, upon information and belief, on or about May 30, 2025, Uber Eats ordered a Driver Record Report ("background report") on Plaintiff from Defendant.

113. Upon information and belief, SambaSafety completed its background report concerning Plaintiff on or about May 30, 2025.

114. Upon information and belief, within that background report, SambaSafety published the Inaccurate Suspensions.

115. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber Eats inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Uber Eats Deactivates Plaintiff's Account**

116. On or about May 30, 2025, Plaintiff was unable to access his Uber Eats account.

117. Plaintiff was at a loss as to how every opportunity he had to be able to earn much needed income was consecutively taken from him by the inaccurate reporting of SambaSafety.

**Plaintiff's June 2025 Dispute to SambaSafety**

118. On or about June 10, 2025, Plaintiff disputed SambaSafety's inaccurate reporting for a second through its online portal.

119. While waiting for his dispute results, on or about June 15, 2025, Plaintiff requested a copy of his MVR from Samba Safety, through its online portal by completing a Consumer Request Form.

120. On or about July 1, 2025, SambaSafety responded to Plaintiff's dispute informing him that it was purportedly unable to investigate his dispute.

121. Defendant failed to issue a corrected consumer report to Uber.

122. Despite Plaintiff's disputes, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's June 2025 dispute and failed to correct the inaccurate information in violation of 15 U.S.C. § 1681i(a)(1)(A).

123. Following this dispute, on or about June 15, 2025, Plaintiff requested a copy of his SambaSafety report.

124. SambaSafety was required to provide to Plaintiff a copy of all information in Plaintiff's consumer file at the time of the request, including the sources of information, and identification information (including name, address, and phone number) of those who procured a consumer report about Plaintiff.

125. Upon information and belief, SambaSafety failed to issue a disclosure in response to Plaintiff's June 15, 2025, request.

126. SambaSafety violated 15 U.S.C. § 1681g by failing to provide to Plaintiff all information in his consumer file, including information that formed the basis of summarized data, as well as all sources of information, including original sources and any intermediary or vendor sources.

**Plaintiff's July 2025 Dispute to SambaSafety**

127. On or about July 12, 2025, Plaintiff sent a third dispute to Samba Safety through its online portal.

128. Plaintiff identified himself and provided the requisite information to SambaSafety to support his dispute.

129. Specifically, Plaintiff noted that his driver's license and CDL privileges were never suspended in February 2022. Plaintiff also noted that the May 2022 suspension only applied to his CDL privileges and that defendant failed to accurately note that his driver's license was not suspended.

130. Plaintiff specifically asked Defendant to investigate and correct its reporting in any consumer report about Plaintiff.

131. SambaSafety failed to respond to Plaintiff's July 2025 dispute.

132. Defendant failed to issue a corrected consumer report to Uber.

133. Plaintiff was absolutely shocked and incensed. Plaintiff had clearly provided SambaSafety with all evidence necessary to correctly conclude that Plaintiff's driver's license had never been suspended.

134. Despite Plaintiff's dispute, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's July 2025 dispute and failed to correct the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Sustained Damages as a Result of Defendant's False and Misleading Reporting**

135. Since losing his ability to drive for Lyft, Uber, and Uber Eats, his only sources of income, Plaintiff has been struggling financially.

136. He has had to use all of his savings and borrow from friends and family to stay afloat.

137. Plaintiff is currently behind on his credit card payments just to afford necessities.

138. Plaintiff has been trying desperately to get another job since his disqualification from Uber and was unable to do so for two months.

139. This is causing Plaintiff incredible stress, as he is financially responsible for his two young kids and his wife, and his wife is unable to work due to an illness.

140. Because Defendant published a grossly inaccurate and misleading consumer report, Uber and Lyft deactivated Plaintiff's account as well as disqualifying him from driving, depriving him of his only source of income.

141. Plaintiff has been depressed due to Defendant's inaccurate reporting and the effect it had on his finances. This has led to him gaining weight and has led to conflict with his wife.

142. Plaintiff had worked hard during his several years driving for Uber to obtain a rating of 4.96 out of 5 stars based upon years of reviews. Number of ratings and the average rating are both used to determine which driver gets offered which rides, making Plaintiff's account substantially more valuable than a newly made account.

143. Plaintiff can no longer benefit from the stellar rating and number of reviews that he worked hard to obtain and maintain.

144. But for Defendant's inaccurate consumer report, Plaintiff would have been able to continue to drive for Uber, Lyft, and Uber Eats and would not have been without income during this time.

145. Due to Defendant's unreasonable procedures, and despite Plaintiff's continued efforts to seek employment, Plaintiff was only able to work Uber Eats, which was by far the least profitable of his gig employers, for approximately one month and was unemployed for approximately one month.

146. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law,

Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

147. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, risk of eviction, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

148. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

149. SambaSafety is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

150. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

151. At all times pertinent hereto, the above-mentioned background report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

152. SambaSafety violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Plaintiff as well as the information it published within the same.

153. As a result of SambaSafety's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and

benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

154. SambaSafety willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

155. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from SambaSafety in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

156. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from SambaSafety in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation

157. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

158. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

159. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

160. On at least one occasion during 2025, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to him, namely, stating that his driver's license was suspended.

161. In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused to correct the consumer report at issue.

162. Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a public source it has reason to know is unreliable.

163. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

164. Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

165. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681g**
**Failure to Provide Consumer Report**

166. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

167. Plaintiff requested a copy of his consumer report from Defendant in or around June 2025 through Defendant's online portal.

168. Upon information and belief, Defendant failed to provide Plaintiff with a copy of his consumer report upon receiving Plaintiff's request.

169. 15 U.S.C. § 1681g requires that consumer reporting agencies supply consumers with all information in their file at the time they make that request, including the source of that information.

170. Defendant is liable to Plaintiff under § 1681g for failing to provide Plaintiff with his consumer report and the source of the driving records it included in Plaintiff's consumer report upon receipt Plaintiff's request.

171. As a result of Defendant's conduct, action and inaction, Plaintiff suffered actual damages which have been further described above.

172. Defendant's violations of the FCRA were willful and knowing. Further, Defendant's violations were committed in reckless disregard of Plaintiff's rights as a consumer. Accordingly, Defendant is liable for Plaintiff's statutory, actual, and punitive damages pursuant to 15 U.S.C. § 1681n.

173. Alternatively, Defendant's violations of the FCRA were negligent, rendering it liable for Plaintiff's statutory and actual damages pursuant to 15 U.S.C. § 1681o.

174. In any event, Defendant is liable for Plaintiff's reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n, 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that SambaSafety negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

Date: November 19, 2025

*/s/ Christopher Kim Thompson*
Christopher Kim Thompson Bar # 015895
Thompson Law
4525 Harding Pike, Suite 203
Nashville, TN 37205
Telephone: 615-832-2335
Email: kim@thompsonslawoffice.com

*Counsel for Plaintiff*
*James Pickard*